IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

M.S. and JACQUELINE          )
SIMCHICK,                    )
                             )
        Plaintiffs,          )
                             )
        v.                   )
                             )
FAIRFAX COUNTY SCHOOL        )
BOARD, *et al.*,             )          1:05cv1476(JCC)
                             )
        Defendants.          )

## M E M O R A N D U M   O P I N I O N

This matter comes before the Court on cross-motions for summary judgment on the administrative record. For the following reasons, the Court will affirm the decision of the hearing officer.

## I.  Background

On December 20, 2005, a minor (hereinafter "M.S.") filed a seven-count complaint by and through his parents, Carl and Jacqueline Simchick ("parents"), with Mrs. Simchick as his co-Plaintiff. Based on a series of events in which the Fairfax County public school system allegedly denied M.S. a free appropriate public education ("FAPE") and filed truancy charges against Mrs. Simchick, Plaintiffs asserted a variety of claims under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, two provisions of the Americans with Disabilities Act ("ADA"), and 42 U.S.C. § 1983. These events began in June 2002, when the Simchicks rejected the

individualized education plan ("IEP") created for M.S. for the
2002-03 school year, removed him from the Fairfax County Public
Schools, and placed him at the Lindamood-Bell Center
("Lindamood") in Washington, D.C.  In June 2004, the Simchicks
requested an administrative hearing pursuant to the IDEA, at
which they sought public funding for the Lindamood placement and
a determination that the IEPs offered for 2002-03, 2003-04, and
2004-05 were inadequate.  In October, 2004, a hearing officer
conducted a seven-day evidentiary hearing.  On January 6, 2005,
the hearing officer issued an opinion including sixteen findings
of fact and legal conclusions on the four issues in dispute.

On the issues of whether a FAPE was provided by each
program, the hearing officer concluded that: (1) the IEPs offered
by Fairfax County for the school years 2002-2005 failed to
provide sufficient defined one-on-one instruction; and (2)
private placement at Lindamood, where education was entirely one-
on-one, did not offer M.S. an appropriate education because it
was too restrictive and did not show significant progress.
Administrative Record 314 at 11 (hereinafter "AR").   The parents
also alleged sixteen procedural violations.  The hearing officer
concluded that the only valid procedural violation was failure to
invite a Lindamood representative to participate in the IEP
meeting, in violation of 34 C.F.R. § 300.344(a).  The hearing
officer finally concluded that the parents were entitled to

-2-

reimbursement for tuition costs for private sign language instruction from September 2002 to January 2005 and private speech and language instruction from February 2003 to July 2004, as well as compensatory services for one hour sessions, three days per week to cover the periods from September 2002 to February 2003 and September 2004 to January 2005.  The hearing officer denied the Simchicks' claim for public funding of the Lindamood placement, and this action followed.

On July 20, 2006, Plaintiffs filed a motion to expand the record beyond that which was developed at the administrative hearing.  Plaintiffs' motion described eight categories of additional evidence: (1) M.S.'s 12th grade IEP/extended school year ("ESY") documentation and related documents; (2) recordings of meetings pertaining to M.S.'s 12th grade IEP/ESY; (3) other evidence concerning M.S's performance and progress at Lindamood and other service providers since the administrative hearing; (4) an expert declaration on the appropriateness and relevance of standardized test scores as a means of measuring M.S.'s educational progress; (5) an expert evaluation and declaration on M.S.'s vocational abilities and whether vocational services are necessary to establish an appropriate education; (6) a complete set of the complaints that were filed with the Virginia Department of Education ("VDOE"), including all related correspondence regarding M.S.; (7) the findings and all documents

-3-

related to the United States Department of Education ("USDOE")
determination that Defendant failed to maintain or provide access
to M.S.'s education records from 2002 until 2004; and (8) any
prior written notices that Defendant provided regarding M.S.,
including any related correspondences.[1]  (*See* Pls.' Mot. to
Expand Record, at 6-9.)

At the hearing on this motion on July 28, 2006,
Magistrate Judge Poretz granted Plaintiffs' motion in its
entirety, but entered an Order on August 4, 2006 expressly
limiting the expansion of the record to the aforementioned eight
categories.  On the same date, Defendant filed written objections
to Judge Poretz's Order, seeking to preclude the admission of the
majority of the evidence cited in the Magistrate Judge's Order.
This Court sustained Defendant's objections to categories 6 and
7, but overruled the remaining objections and allowed Plaintiffs
to supplement the record with categories 1-5 and 8.  Plaintiff
and Defendant then filed cross-motions for summary judgment and
ruling on the administrative record.  These motions are currently
before the Court.

---

[1]These categories of evidence will hereinafter be referred to as
"Category One," "Category Two," and so forth.

-4-

## II.  Findings of Fact

### A) <u>M.S.'s Disabilities and Educational Needs</u>

1.  M.S. was born on May 31, 1988, and resides with his parents, Carl and Jacqueline Simchick in Fairfax County, Virginia.  (AR 314 at 1).  Carl and Jacqueline Simchick are the legal guardians of M.S. pursuant to an order entered by the Circuit Court of Fairfax County, Virginia on June 16, 2006.

2.  M.S. has been diagnosed with mental retardation, a significant communication disorder involving two impairments: severe verbal and oral motor dyspraxia and auditory processing delays.  AR 197E at 1.  M.S.'s dyspraxia affects his mechanical abilities of speech and results in difficulty in formulating words.  Auditory processing delays affect his ability to monitor his verbal output.  *Id.*  M.S. has also been diagnosed with mild to moderate autism, a developmental disorder characterized by significant deficiencies in communication skills, social interaction, and motor control.  (AR 314 at 1, 6, 8).

3.  A speech and language evaluation conducted in October 1992 at the Children's Hospital of Alabama revealed a severe delay in receptive and expressive language skills and limited oral motor skills.  An occupational therapy evaluation conducted at the same hospital in September 1992 revealed delays in gross motor and fine motor skills.  At five years old, tests conducted by Dr. Fleisig at the University of Alabama revealed

significant delays in cognitive functioning and adaptive behavior, and determined that he met the criteria for moderate mental retardation.  (AR 314 at 3).

4.   M.S. has been tested numerous times since the age of three, resulting in an intelligence quotient ("IQ") of between 37 and 41, or the approximate mental functioning of a four-year old.  This places him within the moderately mentally retarded range of cognitive development.  (AR 97 at 6).  M.S. reads at a pre-first-grade level, with significantly deficient math and numerical recognition skills.  (*See generally,* AR 100).  M.S. also has significant deficiencies in his communication abilities and socialization skills.  (AR 97-98).  A triennial evaluation in April 1996 determined eligibility for continued special education as a student with mild retardation and additional speech and language impairment.

5.   Tests and psychological evaluations conducted by Fairfax County Public Schools in September 1996 determined that M.S. possessed limited verbal and nonverbal intellectual abilities, with nonverbal measures functioning in the range of mild to moderate mental retardation.  The tests determined that M.S. needed a highly structured, small class environment with intense language intervention.

6.   Also in September 1996, the parents consulted Dr. Ronald S. Federici, a private neuropsychologist, who determined

that M.S. met the neuropsychological standards for Pervasive
Development Disorder including traits and characteristics of
atypical autism.  Dr. Phillip L. Pearl, MD issued a second
opinion agreeing with the assignment of Pervasive Developmental
Disorder and atypical autism.

      7.  In September 1998, at age eleven, M.S. was given an
augmentative communication evaluation at the Kennedy Krieger
Children's Hospital.  Receptive language testing revealed
receptive vocabulary skills at the three-year, ten-month
equivalence.  Expressive communication tests revealed numerous
sound production errors.  The institution recommended a picture
based augmentative communication system for M.S.

      8.  In December 2000, M.S. was given an auditory processing
evaluation by Dr. Jay R. Lucker ("Lucker"), an audiologist.  Dr.
Lucker found M.S. to have significant problems processing
auditory-verbal information at the levels of decoding and memory,
and recommended that M.S. use an alternative augmentative
communication device in order to effectively communicate with
others.  In a subsequent assessment in December 2001, Dr. Lucker
recommended that M.S. not be a candidate for a training program
such as the Lindamood-Bell Learning Process.  However, Dr. Lucker
later reversed this decision and recommended Lindamood after the
Washington, DC program director convinced him that an
individualized program had been developed for M.S.

9.   A psychological evaluation was conducted by Fairfax County Public Schools in September and October 2001, which determined intellectual abilities in the range of mild to moderate mental retardation.

**B)  <u>Development of the Fairfax County IEPs</u>**

10.   M.S. attended Fairfax County Public Schools ("FCPS") for six years, beginning with the 1996-97 school year and continuing through the 2001-02 school year.  For each year that he attended FCPS, Fairfax County provided M.S. with an IEP designed to meet his educational needs and provide him with a FAPE.  The parents did not challenge any of the IEPs prior to 2002,[2] but did challenge the 2002 IEP and requested a due process hearing.

11.   The initial Fairfax County IEP prepared in April 1996 placed M.S. as a non-categorical student with speech and language instruction in the third grade at Willow Springs Elementary School in Fairfax County.

12.   In July 2001, an IEP was developed for M.S.'s eighth-grade year, which placed him at Rocky Run Middle School.

---

[2]The IEPs for years prior to 2002 are not at issue in determining if the IEPs for subsequent school years were reasonably calculated to confer educational benefit.  However, the parents did provide background information related to M.S.'s lack of academic progress during this time in the areas of speech, occupational therapy, academic objectives, and lack of one-on-one instruction that ultimately led the parents to challenge the 2002 IEP.  The parents also allege that FCPS ignored evidence of M.S.'s autism in formulating their IEPs.  The Court has considered this evidence to the extent that it puts the merits of the challenge in context, but not in judging the subsequent IEPs under the IDEA.

The IEP provided for public education in the areas of mild mental retardation and speech and language impairment.  The IEP also stated that M.S. presents verbal apraxia, creating significant difficulty with oral motor planning, or the ability to make sounds and sequence sounds into words.  It also found M.S. to have a significant short term memory deficit critical to language development.

13.  M.S. attended Rocky Run Middle School in the eighth grade, for the school year 2001-2002.  He was taught by Andrea Monroy ("Monroy") in a class of six students with two assistants.  Ms. Monroy worked with M.S. in six of eight class periods and educational activities.  The class was multi-sensory and language-based, including one-on-one reading and working to recognize letters and words.  M.S. used a specially designed computer and a technology resource teacher, Janis Speck, created programs that allowed M.S. to use picture and word association to formulate sentences.  Ms. Monroy also used a program called Touch Math to work on mathematics skills.  In addition to academic education, the class included life skills learning such as community travel and peer tutor interaction.

14.  Ms. Monroy was in frequent contact with the parents, and a team consisting of M.S.'s teachers, speech and language clinicians, and cluster directors met regularly to

discuss the degree of progress and possible problems with M.S.'s development.

15.   Upon leaving Rocky Run Middle School, M.S. was considered for transition to high school for the year 2002-2003. Prior to the development of the 2002-2003 IEP, the parents provided diagnostic evidence to FCPS indicating that M.S. suffered from autism.  On December 21, 2001, the parents initiated a due process hearing, suggesting the Lindamood program.  On March 5, 2002, Fairfax County proposed to pay for twelve weeks of attendance at Lindamood provided that M.S. return to FCPS upon completion, which the parents rejected.  In May of 2002, a hearing officer concluded that M.S. was a multiple-disability child suffering from brain impairment, autism, apraxia, speech and language pathology, and mental retardation. (AR 188F).  Following this initial hearing, on May 28, 2002 FCPS acknowledged that M.S. suffered from autism and should be classified as having "multiple disabilities."  (AR 166B).

16.   Meetings were then convened on May 28, June 4, and June 11, 2002 regarding development of an IEP for the 2002-2003 school year, in which FCPS rejected placement at Lindamood.

17.   A proposed IEP was prepared for M.S. on June 11, 2002, stating the area of disability to be "multiple disabilities."   The IEP provided two hours per week of speech and language therapy, 1.5 hours per week of physical education,

and one-half hour per week of written language, in addition to other courses, including reading, independence and community, communication, articulation, and oral motor and math skills.  The program included 23.5 hours per week of special education in both small-group special education classes and general education classes with special education support.  The program did not provide for exclusive one-on-one instruction.  (*See* AR 60).

18.  On June 24, 2002, the parents rejected the proposed IEP for the school year 2002-2003 in a letter and informed FCPS that they intended to enroll M.S. privately at the Lindamood center.

19.  At the parents' request, additional IEPs were prepared for the school years 2002-2005, which offered M.S. special education instruction in primarily a group setting.  The programs each offered small reading classes, with student/teacher ratios of four or five students and two teachers for the years 2002-03 and 2003-04, and seven students and two teachers for the year 2004-05.  (Transcript 781, 786-87 (hereinafter "Tr.")).  The programs also included small math and English classes with five students and two teachers, and extensive speech and language therapy on a one-on-one and small group basis.  (Tr. 365).  In addition to academics, the IEPs provided a life skills program to address work behavior, social skills, and peer interaction.  (Tr. 811-13).  The 2004-05 IEP offered an additional basic skills

class for students with autism.  None of the IEPs provided for
guaranteed extensive one-on-one instruction.

   **C) <u>The Parents' Private Placement</u>**

        20.  The parents' private placement consisted of: six
hours per day, five days per week of one-on-one instruction at
the Lindamood-Bell Center in Washington, DC; one hour per week of
one-on-one sign language instruction from a licensed Virginia
teacher; three hours per week in a one-on-one setting of speech
and language therapy through Building Blocks Therapy, LLC; and
the Kids Communication Center; and physical therapy through Broad
Run Riding School, Dance Abilities (a therapeutic dance program),
and the Special Olympics equestrian program.  The parents'
program focused exclusively on one-on-one academic education, and
did not provide group settings in the classroom.

        21.  The Lindamood-Bell Center is not a school
providing a traditional curriculum consisting of subjects such as
math, science, English, and history, nor is it accredited by any
official organization.  (AR 89 at 2; Tr. at 1701-02).  The
individuals who work at the Lindamood-Bell Center are not
certified teachers, but are referred to as clinicians, and are
required to have a high school degree and a week of training at
the center to qualify.  (Tr. at 940-43).  Teaching is performed
on a one-on-one basis between a student and a clinician.
Lindamood does not offer a standard curriculum, but focuses

instead on the development of underlying skills such as phonemic awareness, symbol imagery, and concept imagery.  (Tr. at 834). It does not offer life skills and prevocational preparation.

22.   After an initial assessment and twelve-week intervention program, the director of the Lindamood-Bell Center Lilian Ramsden concluded that placement was appropriate for M.S. (AR 256 at 836-46).  A program was then tailored for M.S. in order to address deficits in sensory cognitive functions, specifically in the functions known as concept imagery, phonemic awareness, and symbol imagery.  (AR 256 at 846-49).

**D) <u>Testing Progress</u>**

23.   Standardized testing was used to measure M.S.'s educational progress under the IEPs and the parents' program.  In both instances, M.S. showed little, if any progress.  His scores continued to fall significantly below the average scores for his age and grade level.  Additional tests by Lindamood found that M.S.'s scores were significantly below his age and grade level. (Tr. at 881).  Additional testing methods, such as criterion-referenced assessments to measure M.S. against a specified set of benchmarks, were performed by Dr. Suzanne Selph to measure academic progress.  (AR 411 at 152).  These tests concluded that M.S. had made "negligible progress across all academic areas." (AR 406 at 6).

### E) <u>The Due Process Hearing</u>

24.  A due process hearing was requested by the parents on the grounds that: (1) the IEPs prepared by Fairfax County for the years 2002-2003 and 2003-2004 did not provide M.S. with a FAPE, and (2) seeking reimbursement for expenses incurred in their own private placement.  An initial Independent Education Evaluation ("IEE") was conducted by Lucker, followed by development of an IEP for the 2004-2005 school year.  The IEP for 2004-2005 was prepared on September 28, 2004.  Similar to the previous year IEP, it offered a transition plan, communication training consisting of sign language, articulation/oral motor, pragmatic skills, oral language and expressive oral language/syntax as well as life skills, functional math, reading-sight words, decoding skills, contextual reading, reading comprehension and written expression, to be provided in a special education setting.  The IEP proposed 9.75 hours per week for autism, 12 hours for mentally retarded, and three hours of speech and language.  The parents rejected this proposal and continued their private placement.  (AR 307).  The adequacy of the 2004-2005 IEP was then added to the due process hearing.

25.  The due process hearing was held over a period of seven days between October 25 and November 5, 2004.  The hearing officer heard testimony from five experts and one lay witness on

behalf of the parents, and four experts and five lay witnesses on behalf of Fairfax County.

26.   The hearing officer examined the evidence and weighed the testimony of M.S.'s eighth-grade teacher Andrea Monroy, Mrs. Simchick, Fairfax County special educator Dr. Suzanne Selph, Dr. Nancy Ticknor, and Dr. Jay Lucker.  (AR 314 at 6-7).  After evaluating this testimony, weighing the evidence and credibility of the witnesses, the hearing officer determined that M.S. made no significant progress under his eighth-grade IEP at Rocky Run Middle School.  Upon an independent review of the evidence and testimony, and giving due weight to the hearing officer's findings of fact and credibility determinations, this Court reaches the same factual finding.

27.   Testimony provided by Andrea Monroy, special education teacher Amy McDaniel, and Dr. Jay Lucker stressed the importance of extensive one-on-one instruction to M.S.'s education.  These witnesses agreed that extensive one-on-one instruction was imperative for a student with M.S.'s unique disabilities and limitations to progress as a student.  (Tr. at 791, 1571, 1782).  The hearing officer accepted this testimony as credible and determined that extensive one-on-one instruction was a necessary element to M.S.'s education.  Upon an independent review of the evidence and giving due weight to the hearing officer's findings, this Court reaches the same conclusion.

28.   The experts also agreed that M.S. needs classroom
time with other students in addition to one-on-one instruction.
Dr. Ticknor recommended a multi-pronged approach that would
emphasize functional reading and writing skills and vocational
training in addition to developing academic skills.  (Tr. at 120-
25).  Dr. Selph and communication disorders specialist Emily
Yaghoubian also recommended a program that would include both
individualized attention as well as social and peer interaction
in a less restrictive group setting.  Contrary testimony was
provided by Mrs. Simchick, Dr. Lucker, and private speech
pathologist Meredith Quellette who testified that M.S. would not
benefit from peer interaction, but would be better served by
intensive one-on-one education in a distraction-free environment.
The hearing officer evaluated the evidence and weighed the
credibility of these witnesses, and agreed with the school
professionals that M.S. would benefit from interaction with peers
and exposure to working skills.  (AR 314 at 10).  An independent
review of the record supports the hearing officer's findings, and
this Court reaches the same conclusion.

29.   The hearing officer examined actual academic
progress made on standardized tests and concluded that no actual
academic progress was made in two years at Lindamood.  Weighing
all of these evaluations into a final decision, the hearing
officer concluded that the private placement at Lindamood was not

appropriate "because it was too restrictive and it didn't show significant progress." (AR 314 at 11). Some evidence was presented indicating progress at Lindamood in non-academic areas. Dr. Lucker testified that progress had been made in functional communication. (Tr. at 1558). Mrs. Simchick testified that M.S. progressed from knowing three words to reading 150-180 words. (Tr. at 1342). However, tests performed by Dr. Selph indicated a lack of progress in actual reading ability, with negligible progress in letter and word recognition. (AR 411 at 80-81, 166-68, 177-83). The hearing officer concluded that no actual academic progress was made at the Lindamood-Bell Center. After an independent review, this Court finds that the record supports the hearing officer's finding and agrees.

### F) <u>The Hearing Officer's Decision</u>

30. The hearing officer determined in this case that the IEPs provided by Fairfax County for the school years 2002-2005 did not provide a FAPE, finding that each IEP failed to provide sufficient and reliable one-on-one instruction and violated the IDEA.[3] (AR 314 at 16). He considered the testimony of the various witnesses at the hearing and found a general agreement among their opinions that M.S. needed personal instruction in all of his academic subjects. (AR 314 at 10).

---

[3]The hearing officer also noted that the IEP for the school year 2001-2002 at Rocky Run Middle School was not at issue.

The hearing officer then considered the IEPs provided by Fairfax County, and found an overemphasis on group activity and inadequacy of one-on-one personal instruction, and also found that the IEPs "do not require specific hours of one-on-one instruction; rather it is left to the teacher to use the time she deems most appropriate." (AR 314 at 9). The hearing officer considered this a problem because the IEPs themselves provided mostly for instruction in a group setting, and there was no guarantee of one-on-one instruction. (AR 314 at 10). The hearing officer finally determined that the IEPs provided by the County were not appropriate under the Act because they failed to provide MS with the intensive, one-on-one personal attention that his education requires. (AR 314 at 11).

31. While finding that the Fairfax County IEPs were inappropriate under the IDEA, reimbursement was denied due to a subsequent determination that deemed the Lindamood placement inappropriate. The hearing officer made several factual determinations leading him to the ultimate conclusion that Lindamood was not reasonably calculated to enable M.S. to receive an educational benefit. After weighing seven days of testimony and numerous witnesses from each side, he found that Lindamood was not a school, did not incorporate fundamental elements that M.S. needed in his educational program, and was overly restrictive. (AR 314 at 8).

32.   Evaluating the Lindamood program, the hearing officer
found that: (1) the program lacked qualified teachers,
appropriate curriculum, opportunity for group instruction and
social or peer interaction, vocational instruction, and life
skills instruction; (2) the program was overly restrictive; and
(3) actual progress was not made.  The hearing officer further
found that while M.S.'s low IQ seriously limited his potential
for academic development, testimony by the school's psychologist,
Dr. Ticknor, convinced him that there was some room for
improvement, making academic instruction essential to an
appropriate educational program.  (AR 314 at 9).  Furthermore,
the hearing officer was convinced by the school experts that a
multi-pronged approach was needed for M.S.'s education, which
would include group instruction and peer interaction.  (AR 314 at
9).  The hearing officer was also convinced by the school's
witnesses that M.S., at age 16, would benefit from occupational
training and exposure to work skills in addition to peer
interaction, and found the parents' program lacking in this
respect.  (AR 314 at 10).

### III.   Standard of Review

Summary judgment is appropriate only if the record
shows that "there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a matter of
law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996)(citations omitted).  In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir. 1991)(citations omitted).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 248-52.  Rather, the Court must determine whether the record as a whole could lead a reasonable trier of fact to find for the non-movant. *Id.* at 248.

A district court reviewing a state administrative decision under the IDEA may grant summary judgment based upon the administrative record.  *See, e.g., DeLullo v. Jefferson Co. Bd. of Educ.,* 71 F. Supp. 2d 554 (N.D. W. Va. 1998), *aff'd,* 194 F.3d 1304 (4th Cir. 1999).  Actions authorized under this provision are procedurally unique in that they are independent civil actions in which the district court considers the record of the state administrative hearing, as well as any new evidence offered by a party, and makes findings based on the preponderance of the evidence.  *See County Sch. Bd. of Henrico v. Z.P.,* 399 F.3d 298,

304 (4th Cir. 2005)(citing 20 U.S.C. § 1415(i)(2)(B)).  The court should make an independent decision based on a preponderance of the evidence, yet give due weight to the state administrative findings.  *See Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 369 (1985); *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 105 (4th Cir. 1991).

In particular, the reviewing court should consider the factual findings in an IDEA agency decision to be *prima facie* correct.  *See Kirkpatrick v. Lenoir County Bd. Of Educ.,* 216 F.3d 380, 385 (4th Cir. 2000).  When fact-findings are regularly made and entitled to *prima facie* correctness, the district court is required to explain any disagreements or deviations from those findings.  *County Sch. Bd. of Henrico,* 399 F.3d at 304.  Due regard shall be given to the hearing officer's judgements as to the credibility of the witnesses.  *Doyle,* 953 F.2d at 104-05. Credibility determinations implicit in a hearing officer's decision are also entitled to deference.  *County Sch. Bd. of Henrico,* 399 F.3d at 306-07 (citing *A.B. ex rel. D.B. v. Lawson,* 354 F.3d 315, 327-28 (4th Cir. 2004).  After giving the administrative fact-findings such due weight, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute.  *Id.*  In cases where the hearing officer and the reviewing officer's findings are in accord, even greater deference is due to the administrative

-21-

findings.  *See Combs v. Sch. Bd. of Rockingham County,* 15 F.3d
357, 361 (4th Cir. 1994).

A hearing officer's application of the law to fact is
reviewed *de novo.  See Fort Zumwalt Sch. Dist. v. Clynes,* 119
F.3d 607, 611 (8th Cir. 1997).  The party seeking to overturn a
state administrative officer's decision bears the burden of proof
in showing that the decision was erroneous.  *See Barnett v.
Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir. 1991); *cf.
Schaffer v. Weast,* 546 U.S. 49 (2005).

## IV.   Applicable Law

### A) <u>The IDEA</u>

The purpose of the IDEA is "to ensure that all children
with disabilities have available to them a free appropriate
public education that emphasizes special education and related
services designed to meet their unique needs and prepare them for
employment and independent living."  20 U.S.C. § 1400(d)(1)(A).
To achieve this purpose, the IDEA extends federal funding to the
States to provide disabled schoolchildren with a "free
appropriate public education" ("FAPE").  *Id.* at § 1412(a)(1)(A).
A FAPE is provided by school districts in public schools in the
so-called "least restrictive environment," or the educational
environment suitable for the disabled student that is most
similar to the public school environment in which non-disabled
children are educated.  *Id.* at § 1412(a)(5); *Sch. Bd. of Prince*

-22-

*William County v. Malone,* 762 F.2d 1210, 1213 (4th Cir. 1985).
However, where the public school district is unable to provide a
FAPE in the public schools, the IDEA requires the school district
to assume the cost of educating the child in a private school
that meets the child's educational and social services needs.
*Id.* at § 1412(a)(10)(B).

        The IDEA establishes detailed procedures for IEP
development and review.  If a dispute arises over the sufficiency
of an IEP, the statute requires the parents to notify the school
district of their complaints, enter into mediation, and if that
is not successful, allows the parents to bring a due process
action before an impartial state or local administrative hearing
officer.  20 U.S.C. §§ 1415.  A party aggrieved by the decision
of the hearing officer may file a civil action in a state or
federal district court.  *Id.* at § 1415(i)(2).

   **B) A Free Appropriate Public Education**

        A FAPE "consists of educational instruction specially
designed to meet the unique needs of the handicapped child...
supported by such services as are necessary to permit the child
to benefit from the instruction."  *Rowley,* 458 U.S. at 188-89.  A
FAPE is implemented through an IEP, which is designed by a team
consisting of school district educators and administrators,
education experts, and, of vital importance, the child's parents.
IEPs "must contain statements concerning a disabled child's level

of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville County,* 303 F.3d 523, 527 (4th Cir. 2002); *see also* 20 U.S.C. § 1414(d)(1)(A).

The FAPE requirement is satisfied when a State provides the handicapped child with "personalized instruction with sufficient support services to permit the child to benefit educationally from the instruction." *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 106 (4th Cir. 1991)( citing *Rowley,* 458 U.S. at 203). To provide an "appropriate" education within the meaning of the IDEA, the school district does not have to provide the child with the best possible education. *M.M.,* 303 F.3d at 526. Once a FAPE is offered, the school district need not offer additional educational services. *Id.* That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential. *Id.* at 526-27. However, "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall ex rel. Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 636 (4th Cir. 1985). Setting

-24-

the substantive standard, the Supreme Court has stated that an
IEP is sufficient if it is "reasonably calculated to enable the
child to receive educational benefits." *Rowley,* 458 U.S. at 207.
In making this determination, a reviewing court must defer to
educators' decisions as long as an IEP provided the child "the
basic floor of opportunity that access to special education and
related services provides." *See Tice by and Through Tice v.
Botetourt County Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir.
1990)(quoting *Rowley,* 458 U.S. at 201).

## V.  Conclusions of Law

### A) <u>The Fairfax County IEPs</u>

In the January 6, 2005 opinion, the hearing officer
concluded that the IEPs for the 2002-2003, 2003-2004, and 2004-
2005 school years did not provide M.S. with a FAPE, because they
relied heavily on a classroom group study and did not adequately
address M.S.'s need for extensive one-on-one instruction.  (AR
314 at 11).  The IDEA does not require extensive one-on-one
education for all children with multiple disabilities, but rather
requires an individualized program designed to "meet [the
child's] unique needs and prepare [him] for employment and
independent living."  20 U.S.C. § 1400(d)(1)(A).  Accordingly, to
provide a FAPE, the IEPs developed by Fairfax County must have
addressed M.S.'s unique needs.

The record supports the hearing officer's conclusion that intensive one-on-one instruction is essential to M.S.'s progress as a student.  The various experts who testified at trial, such as Andrea Monroy, M.S.'s eighth-grade teacher, agreed on this point.  While Fairfax County's experts Nancy Ticknor and Emily Yaghoubian advocated a multi-pronged approach, they also agreed that one-on-one instruction was essential for a student with M.S.'s unique disabilities.  A review of the evidence reveals that the IEPs for 2002-2005 did not adequately address this specific and very important need.  Instead, the IEPs provided for some individualized instruction, without guarantee, and a primary focus on group settings in small classes.

### 1) **Deference to the Educators**

Defendant argues that an opportunity for one-on-one instruction was provided, and it is the decision of the educators how to best meet the identified goals.  At all levels of an IDEA proceeding, including administrative review, the opinions of the professional educators are entitled to respect.  *See Rowley,* 458 U.S. at 206, ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.").  Deference is to be given to educators, who are themselves the best qualified to develop educational programs.

-26-

However, the respect and deference that must be accorded to those professional opinions does not give a district court license to ignore the requirement of *Rowley* and *Doyle* that the findings of the *administrative proceeding* must be given due weight.   *County Sch. Bd. of Henrico*, 399 F.3d at 307.   Nor does the required deference to the opinions of the professional educators relieve the hearing officer or the district court of the obligation to determine as a factual matter whether a given IEP is appropriate.   Thus, the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate.   *Id.*

In this case, both the educators and the hearing officer agreed that a combination of individualized attention and some level of group interaction are necessary to confer educational benefit.   In this respect, deference was given to the decisions of the educators by the hearing officer, and is also given by this Court.   However, the IEPs offered by Defendant provided a group classroom as the primary setting and only left open the possibility of individualized instruction after a teacher decides that it would be useful.   Testimony of Defendant's witnesses indicates that one-on-one instruction would be available, but not integral to the program.   For example, Emily Yaghoubain explained that under the IEPs, M.S. would receive speech therapy in a group setting and if a speech

clinician "saw the need to pull him to do some one-on-one work, she would be able to do that."  (Tr. at 448-49).  Dr. Ticknor's testimony further supported a flexible program focusing primarily on a group setting.

While testimony of Defendant's witnesses supported some advantages to a flexible program, adequacy rather than flexibility is the issue in this case.  A number of educators, clinicians, and experts have already determined that individualized attention is essential to M.S.'s education.  Thus, a flexible program that may provide some one-on-one instruction upon an additional determination of need, as provided by the 2002-2005 IEPs, is insufficient.  Moreover, catchall statements such as "whatever M.S. needs, those services can be provided" are insufficient to assure that adequate one-on-one attention and personal instruction is a part of the educational curriculum. (Tr. at 422-23).  Accordingly, this Court concludes that proper deference has been given to educators regarding the soundness of their own educational policies, but nevertheless, the program was inadequate and did not provide a FAPE to M.S.  The County's flexible IEPs did not adequately address this essential need and were thus inadequate to provide M.S. with a basic floor of opportunity.

## 2) <u>Consideration of Progress for the IEPs</u>

Actual educational progress is a factor to be considered in determining the appropriateness of an educational program under the IDEA. *M.M. v. Sch. Dist. of Greenville County,* 303 F.3d 523, 532 (4th Cir. 2002); *see also Rowley,* 458 U.S. at 207, fn28 ("achievement of passing marks and advancement from grade to grade...[are an] important factor in determining educational benefit"). While the standard for evaluating the appropriateness of a private placement under the IDEA is generally prospective, objective factors such as actual educational progress are relevant in making the final determination of appropriateness under the IDEA. *See County Sch. Bd. of Henrico County, Va. v. R.T.,* 433 F. Supp. 2d 657, 675 (E.D. Va. 2006); *compare Adams v. Oregon,* 195 F.3d 1141, 1149 (9th Cir. 1999) *w. M.M.,* 303 F.3d at 532.

Because the 2002-2005 IEPs were never implemented, a measurement of program success by objective criteria is not possible. However, in rendering the administrative decision, the hearing officer did examine objective criteria related to the eighth-grade IEP. After a review of the record, this Court finds no error in consideration of this evidence. While the IEPs prior to 2002 are not at issue in this case, they are important in placing M.S.'s educational needs and progress in context for the development of later IEPs. Furthermore, the eighth-grade IEP was

very similar to the proposed IEPs for 2002-2005 and suffered from many of the same deficiencies.  Each IEP, including the eighth-grade IEP, contained significant placement in a mental retardation program, no guaranteed one-on-one instruction, and until the 2005 IEP, no sign language instruction and a limited focus on communication deficits.  Thus, the eighth-grade IEP, while different in some respects to the prospective IEPs,[4] is in essence very similar, and offers a viable measuring stick for potential success for the proposed IEPs.  In this respect, an analysis of the eighth-grade IEP was relevant to the resolution of the FAPE issue.

The record supports the hearing officer's conclusion that no notable progress was made under the previous Fairfax County IEPs.  M.S. did not reach any of his goals or objectives for the eighth-grade year, and made no significant progress under the eighth-grade IEP.  Evidence submitted by Fairfax County regarding the Brigance and Phonographix Tests as well as communication therapy shows only minimal progress.  Thus, this Court concludes that the lack of success shown under the eighth-grade IEP further supports the hearing officer's conclusion that the Fairfax County IEPs were not reasonably calculated to provide educational benefit.  Accordingly, the hearing officer's decision

---

[4]For example, the IEPs developed for 11th and 12th grades offer significant hours of time for autism, whereas the pre-2002 IEPs offered none, and the 12th grade IEP offers one hour for sign instruction.

that the Fairfax County IEPs for the years 2002-2005 did not provide a FAPE will be affirmed.

### 3) **Conclusion**

For the foregoing reasons, this Court concludes that the IEPs developed by Fairfax County for the school years 2002-2005 did not provide M.S. with a FAPE, as required by the IDEA. The record supports the hearing officer's findings of fact, and applying those facts and the additional findings of fact made by this Court to law, this Court finds, by a preponderance of the evidence, that the IEPs did not adequately address M.S.'s need for extensive one-on-one instruction and thus was not reasonably calculated to confer educational benefit.

## B) **The Private Placement at Lindamood-Bell**

When a court or hearing officer finds that the school district did not make a FAPE available to the child in a timely manner, the IDEA allows parents to place their disabled child in a private school and receive reimbursement.  20 U.S.C. § 1412(a)(10)(C).  However, while reimbursement is not barred because the private school fails to meet the standards of the state educational agency, parents may receive retroactive reimbursement for private educational services unilaterally provided to their child only if a court concludes both: (1) the public placement violated the IDEA; and (2) the private placement was proper under the IDEA.  *See Deal v. Hamilton County Bd. of*

*Educ.,* 392 F.3d 840, 855 (6th Cir. 2004); *Florence Co. Sch. Dist. Four v. Carter,* 510 U.S. 7, 15 (1993).  A private placement is deemed proper or appropriate under the IDEA if the education provided is reasonably calculated to enable the child to receive educational benefits.  *Carter,* 510 U.S. at 11 (quoting *Rowley,* 458 U.S. at 207).  "Reimbursement is a matter of equitable relief, committed to the sound discretion of the district court ...usually reserved for parties who prevail at the end of the placement dispute."  *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 999 (1st Cir. 1990) (citations omitted).  As the Supreme Court has stated, "parents who unilaterally change their child's placement...without the consent of state or local school officials, do so at their own financial risk."  *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 373-74 (1985).  Where a unilateral placement is not appropriate, recovery will be denied on that basis alone.  *M.S. v. Yonkers Bd. of Educ.,* 231 F.3d 96, 104-05 (2d. Cir. 2000).

The hearing officer rejected the parents' claim for reimbursement because the Lindamood-Bell Center was not an appropriate placement.  For the following reasons, this Court finds that a preponderance of the evidence supports the hearing officer's denial of reimbursement for the Lindamood placement.

**1)** __Objections to the Hearing Officer's Findings of Fact__

This Court has determined that the hearing officer's findings of fact were regularly made and entitled to due weight. *See supra,* Findings of Fact.  Furthermore, upon a review of the record, this Court finds no reason to doubt the weight and credibility determinations made by the hearing officer in evaluating the testimony of witnesses.  The parents' argument that the hearing officer's findings of fact were not regularly made and therefore not entitled to deference lacks merit. Accordingly, this Court will review the hearing officer's decision, giving due weight to all findings of fact, and then decide *de novo* the issue of legal appropriateness under the IDEA of the Fairfax County IEPs and the parents' program.

**2)** __Parents' Program__

As this Court and others have held, a program that addresses only one academic area cannot be deemed appropriate under the IDEA.  *See Fairfax County Sch. Bd. v. Knight,* Civ. No. 05cv1472 (E.D. Va. 2006); *see also Rafferty v. Cranston Public Sch. Comm.,* 315 F.3d 21, 26-27 (1st Cir. 2002) (finding the private placement inappropriate because although "the tutoring did improve her reading ability, she did not study any other subjects, such as social studies, math, English, or science."). The parents' unilateral placement included thirty hours per week of one-on-one instruction at the Lindamood-Bell Center in

Washington, DC, one hour per week sign language instruction by a
licensed Virginia teacher, three hours per week of one-on-one
speech and language therapy through Building Blocks Therapy, LLC
and the Kids Communication Center, and physical therapy.  (*See* AR
258 at 1328-34).  Thus, the parents' program was dedicated almost
entirely to instruction at the Lindamood-Bell Center.

         The various experts agreed that while M.S. is limited
academically, there is room for improvement with an appropriate
curriculum.  Testimony by M.S.'s former teachers and expert
witnesses such as Dr. Ticknor specified the importance of group
instruction, peer interaction, vocational preparation, and life
skills training as essential areas of educational need for
someone with the extent of M.S.'s disabilities.  However, as
detailed in Findings of Fact ¶¶ 20-22, Lindamood provides
extensive one-on-one instruction and dedication to communicative
development, but it is not an actual school, and does not provide
comprehensive academic curriculum including standard subjects
such as mathematics, history, science, and English.  Moreover,
Lindamood does not provide group instruction, peer interaction,
vocational preparation, and life skills training.  While this
Court recognizes that M.S.'s unique disabilities complicate the
effectiveness of a "normal" curriculum, a program that focuses
almost entirely on communication skills without any of the other
suggested areas is not reasonably calculated to confer

-34-

educational benefit.  The parents' program, which only addressed one core area of need, did not provide this opportunity. Accordingly, the Court finds that the record supports the hearing officer's conclusion that the parents' program was not reasonably calculated to confer an educational benefit.

### 3) Consideration of Actual Progress and Testing

While the standard for evaluating the appropriateness of a private placement under the IDEA is generally prospective, objective factors such as actual educational progress are relevant in making the final determination of appropriateness under the IDEA.  *See County Sch. Bd. of Henrico v. R.T.,* 433 F. Supp. 2d 657, 675 (E.D. Va. 2006); *compare Adams v. Oregon,* 195 F.3d 1141, 1149 (9th Cir. 1999) *w. M.M.,* 303 F.3d at 532.  Actual educational progress is not a dispositive factor, but it is a factor to be considered in determining the appropriateness of an educational program under the IDEA.  *M.M.,* 303 F.3d at 532; *see also Rowley,* 458 U.S. at 207, fn28 ("achievement of passing marks and advancement from grade to grade...[are an] important factor in determining educational benefit").

A review of the record, including Lindamood's own measurements, the testimony of Dr. Selph, and standardized test data supports the hearing officer's conclusion that minimal progress has been made at Lindamood.  Evidence added as a supplement to the record since the administrative hearing further

confirms lack of progress at Lindamood.  Plaintiffs have offered evidence, including sample tests conducted at Lindamood and progress reports compiled by Dr. Wyrick, which shows progress in reading and verbal skills.  However, after an examination of the evidence and determinations as to the credibility of each set of witnesses, the hearing officer determined that the parents' evidence of functional progress was highly subjective and outweighed by the lack of measurable academic progress.  (AR 314 at 7-8).  Finally, evidence of additional testing admitted since the administrative hearing bolsters Defendant's argument that no actual academic progress has been made under the Lindamood program.  (AR 411 at 79-83).  This testing not only indicated lack of progress in mathematics and reading, but also showed social regression attributable to an exclusive one-on-one educational environment without peer group interaction.  The parents' attempt to rebut this evidence with subjective reading tests (AR 196) and testimony that merely states M.S. made "amazing progress" (AR 256 at 893) are insufficient to overcome this objective data.  Thus, after an examination of the record, this Court reaches the same conclusion as the hearing officer and finds the parents' evidence of progress to be overly subjective and outweighed by the objective data presented by Defendant.  Accordingly, this Court finds that a preponderance of the

evidence supports the conclusion that M.S. has not made actual academic progress under the private placement.

### 4) __Restrictive Nature of Lindamood__

The parents appeal the administrative decision on the ground that the hearing officer misapplied the "least restrictive environment" requirement.  A "least restrictive environment", defined as the educational environment suitable for the disabled student that is most similar to the public school environment in which non-disabled children are educated, is required under the Act.  *County Sch. Bd. Of Henrico,* 433 F. Supp. 2d at 660 (citing 20 U.S.C. 1412); *Sch. Bd. Of Prince William Co. V. M.A.*, 762 F.2d 1210, 1213 (4th Cir. 1985).  However, mainstreaming [or the providing education in the least restrictive environment] is a policy to be pursued so long as it is consistent with the IDEA's primary goal of providing disabled students with an appropriate education, and when necessary for educational reasons, assumes a subordinate role in formulating an educational program.  *Hartmann v. Loundon County Bd. of Educ.,* 118 F.3d 996, 1002 (4th Cir. 1997).

The Fourth Circuit has expressed strong doubt as to whether the least restrictive environment requirement of the IDEA, 20 U.S.C. § 1412(5)(A), applies to parental placements.  *See, e.g., Carter,* 950 F.2d at 160; *Morgan v. Greenbrier County Bd. of Educ.,* 83 Fed. Appx. 566, 568 (4th Cir. 2003).  The Fourth

Circuit has explained, "the Act's preference for mainstreaming was aimed at preventing *schools* from segregating handicapped students from the general student body." *Carter,* 950 F.2d at 160 (emphasis in original). Furthermore, other Circuits addressing the issue have held that the least restrictive environment requirement does not apply with the same force to parental placements as it does to placements advocated by school districts. *See M.S. ex rel. S.S.,* 231 F.3d at 105 (stating that mainstreaming "remains a consideration" but noting that parents "may not be subject to the same mainstreaming requirements"); *Cleveland Heights-University Heights Sch. Dist. v. Boss,* 144 F.3d 391, 399-400 (6th Cir. 1998) (failure to meet mainstreaming requirements does not bar reimbursement). While it is clear that the least restrictive environment requirement should not be applied in the strictest sense, it remains a consideration that bears upon the parents' choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate. *See M.S. ex rel. S.S.,* 231 F.3d at 105.

After reviewing the record, this Court finds that the hearing officer appropriately considered the restrictive nature of Lindamood in his determination that the program was inappropriate. It is clear from a review of the opinion that the hearing officer did not deny the claim for reimbursement solely

on the ground that a least restrictive environment was not
provided.  Instead, the hearing officer weighed the restrictive
nature of the program, which he found did not provide opportunity
for work training, social interaction, and adequate group time.
The record supports this conclusion, and this Court agrees that
Lindamood's restrictive environment is a factor to be considered
in determining appropriateness under the IDEA.  After doing so,
this Court agrees with the hearing officer that Lindamood is a
highly restrictive and specialized environment, in which the
hearing officer concluded M.S. "simply has no room to grow and
mature."  (AR 314 at 10).  The program is overly restrictive in
the sense that it wholly lacks peer interaction, group teaching,
and occupational training.  Accordingly, while the parents are
not required to provide a program in the "least restrictive
environment," the restrictive nature of the parents' chosen
program at Lindamood reinforces this Court's conclusion that it
was not appropriate under the IDEA.[5]

   C)   **The 2005-06 IEP**

        After finding the 2002-2005 IEPs inappropriate due to
overemphasis on education in a group setting, the hearing
officer's Order required future IEPs to contain "reliable and

---

[5]The Court is very moved by the Simchicks' unfettering devotion and
dedication to their child's well-being.  The Court believes strongly that the
Simchicks did what they believed to be best for M.S.  Nonetheless, their
choice in placement was not legally compliant, and sympathy alone cannot untie
the Court from the binds of the law.

intensive" one-on-one services in the academic courses offered
for M.S.  (AR 314 at 16).  The IEPs then developed by Fairfax
County for the 2005-06 school year specified 12.75 hours per week
to be spent in a one-on-one setting, with the remaining 17.25
hours of the thirty hour week to be spent in group settings.  The
IEP further provided the opportunity for additional one-on-one
assistance as needed, to be determined by the educators.

As noted *supra,* at all levels of an IDEA proceeding,
including administrative review, the opinions of the professional
educators are entitled to respect.  *See Rowley,* 458 U.S. at 206.
A reviewing court is to base its decision on the preponderance of
the evidence, giving deference afforded to educators and avoiding
the temptation to substitute its own notions of sound educational
policy for those of the school authorities that they review.  *Id.*
In this case, Fairfax County developed an IEP that specifically
included intensive one-on-one instruction, in conjunction with
group instruction.  The County developed a program that addressed
the hearing officer's concerns regarding the old IEPs, but also
addressed the concerns that Lindamood did not provide ample group
instruction.  Essentially, the IEP's created by Fairfax after the
hearing officer's Order struck a balance between Lindamood and
the old IEPs and addressed the hearing officer's concerns with
each individual program.  It offered both "reliable and intensive
one-on-one instruction" as well as the group instruction and

-40-

vocational training that Lindamood lacked.  Accordingly, the
2005-06 IEP complied with the hearing officer's Order, and was
appropriate.

### D) Reimbursement Claims

While the Court will not award reimbursement for the
private placement at Lindamood, the Court agrees with the hearing
officer's decision that a denial of FAPE warrants relief for
related services.  Accordingly, Plaintiffs' motion for summary
judgment on the administrative record will be granted for this
issue, and the Court will order Fairfax County to provide the
parents with the following relief:  (1) compensation for the
private tuition costs for sign language instruction from
September 2002 to January 2005 and (2) compensation for tuition
for private speech and language instruction from February 2003 to
July 2004 and compensatory services of three hours per week to
cover the gaps from September 2002 to February 2003 and from
September 2004 to January 2005.

Furthermore, this Court has discretionary authority to
award pre-judgment interest pursuant to Va. Code § 6.1-330.54.
*See Quesinberry v. Life Ins. Co.,* 987 F.2d 1017, 1030 (4th Cir.
1993); *M.M.,* 303 F.3d at 530.  A factor in deciding a pre-
judgment interest award is whether such an award is "necessary to
compensate the plaintiff[s] fully for [their] injuries."  *Mary
Helen Coal Corp. v. Hudson,* 235 F.3d 207, 210 (4th Cir. 2001).

Considering the length of the dispute at hand, this Court finds that pre-judgment interest is necessary to fully compensate the Plaintiffs.  Accordingly, pre-judgment interest will be awarded to the Plaintiffs for amounts spent on related services outlined above.

Finally, post-judgment interest on the amount of judgment is required under 28 U.S.C. § 1961, and the Court has discretion to include pre-judgment when that interest is a portion of Plaintiffs' damages.  *Quesinberry,* 987 F.2d at 1031. Such an award is justified in this case, and closely comports with the purpose of post-judgment interest articulated by the Supreme Court and followed by the Fourth Circuit.  *Id.* Accordingly, this Court will apply pre-judgment interest to any amount of post-judgment interest due by Defendant on the related services.

## VI.  Conclusion

For the foregoing reasons, the Court will affirm the hearing officer's decision.  Accordingly, both Plaintiffs' and Defendant's cross-motions for summary judgment will be granted in part and denied in part.  An appropriate Order will issue.


May 8, 2007                    _____/s/_____
Alexandria, Virginia               James C. Cacheris
                           UNITED STATES DISTRICT COURT JUDGE

-42-